UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENNIS KITSOCK, individually and as the beneficiary under the issued policy of insurance, and as administrator of the Estate of John Kitsock, and the ESTATE OF JOHN KITSOCK, | : : : : : : | 3:12-CV-01728 |
| Plaintiffs | : : | |
| v. | : : : | (Magistrate Judge Schwab) |
| THE BALTIMORE LIFE INSURANCE COMPANY | : : : | |
| Defendant | : | |

# MEMORANDUM

## I. Introduction.

The plaintiffs claim that the defendant breached a contract of insurance and acted in bad faith in denying accidental death benefits under a life insurance policy issued to John Kitsock. Discovery is complete, and the defendant has filed a motion for summary judgment. For the reasons discussed below, we will grant the defendants' motion for summary judgment.

## II. Background and Procedural History.

The plaintiffs, Dennis Kitsock ("Kitsock"), acting individually and as administrator of the Estate of John Kitsock, and the Estate of John Kitsock, began

this action by filing a complaint naming the Baltimore Life Insurance Company as the defendant and alleging that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). After pointing out that the plaintiffs failed to properly plead the citizenship of either Kitsock or the defendant, Judge Caputo gave the plaintiffs leave to file an amended complaint. On September 12, 2012, the plaintiffs filed an amended setting forth the citizenship of the parties. The amended complaint contains two counts based on the defendant's refusal to pay accidental death benefits under a life insurance policy issued to John Kitsock after John died allegedly from injuries he sustained when he fell and struck his head on his bed rail. Count One is a claim for breach of contract, and Count Two is a claim for bad faith under 42 Pa.C.S.A. §8371.

On November 1, 2012, the defendant filed an answer to the amended complaint. The case was later reassigned to Judge Mannion, who scheduled a case management conference. After the parties informed him of their desire to proceed before a magistrate judge, Judge Mannion cancelled that case management conference and directed the Clerk of Court to send a consent form to the parties. Thereafter, the parties executed the consent form to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and, on March 12, 2013, the case was referred

to the undersigned to conduct all proceedings and order the entry of a final judgment. We then held a case management conference.

Discovery is complete, and the defendants' motion for summary judgment is pending. The plaintiffs did not file a brief in opposition to the motion for summary judgment, and pursuant to Local Rule 7.6, they are deemed not to oppose the motion. Nevertheless, we must still determine whether the defendant is entitled to summary judgment as a matter of law. *Anchorage Associates v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). Moreover, although the plaintiffs did not file a brief in opposition to the motion for summary judgment, they did file a response to the defendant's statement of material facts, which response shows that they in fact do oppose the motion. Thus, we address the merits of the motion for summary judgment, which, for the reasons discussed below, will be granted.

**III. Discussion.**

    **A. Summary Judgment Standard.**

The defendant has moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P.

56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.  When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## B. The Material Facts.

A party who seeks to resist a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Under this Rule, the failure to follow these instructions and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed admitted. Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.*

The defendant filed a statement of material facts, and the plaintiffs filed a response. While the plaintiffs admit almost all of the facts set forth by the defendant, in some instances they present additional facts. Based on the statement

of material facts filed by the defendant and the plaintiffs' response, the following facts are either undisputed or, where the plaintiffs have presented evidence, the plaintiffs' version of the facts.

John Kitsock purchased a life insurance policy from Baltimore Life in 1987. *Doc. 33-1 (Baltimore Life's Statement of Undisputed Facts in Support of its Motion for Summary Judgment)* at ¶1 and *Doc. 40 (Plaintiffs, Dennis Kitsock, et al.'s, Statement of Undisputed Facts in Defense to Baltimore Life Insurance Company's Motion for Summary Judgment)* at ¶1. That policy included an Accidental Death Benefit Rider, which paid an additional benefit when Baltimore Life receives proof of the accidental death of the insured. *Id.* at ¶2. The accidental death benefit under the policy applies when the insured's death occurred "solely through external, violent and accidental bodily injury," but the accidental death benefit does not apply "to a death that results solely or partly from . . . mental or bodily infirmity, illness, disease or infection." *Id.* at ¶3. Dennis Kitsock was the beneficiary under the policy that his brother, John Kitscock, purchased. *Id.* at ¶4.

In May of 2010, after John Kitsock fell and broke his hip, he was hospitalized for "rehabilitation for walking." *Id.* at ¶5. Medical records confirm that he was also diagnosed with COPD and alcohol abuse. *Id.* Over the last eighteen months of his life, John had a history of falls, and he used a cane. *Id.* at ¶6. In March of 2009, he

was prescribed a walker, which his home health care nurse noted that he used. *Id.* at ¶7.  Approximately a month before his death, John's home health care nurse noted that his activity level was "as tolerate [sic] with walker," that he uses a walker to ambulate, and that he has a "slow unsteady gait." *Id.* at ¶8.  On July 30, 2010, John reported to the nurse that he had fallen earlier in the week. *Id.* at ¶9.

Beginning in May of 2009, John was seen regularly by Dr. Stefovic, who noted the following symptoms and diagnosis: significant weight loss; heavy drinking; bullous emphysema changes in his lungs; atherosclerotic disease; shortness of breath from any form of exertion; continuous tremors in his arms and his legs secondary to potential wet brain syndrome, i.e., Wernicke-Korsakoff Syndrome; degenerative arthritis; cachexia; Smoker's Syndrome; and unipolar depression, which was severe and recurrent without psychotic features. *Id.* at ¶10. Dr. Stefovic also noted that John used a walker and a cane occasionally because he "doesn't have the strength to hold himself up." *Id.*   On one of the last occasions on which Dr. Stefovic saw John, he noted that John had fallen again a little more than a month before. *Id.* at ¶11.

On August 30, 2010, Kitsock went to his brother's room to get him for breakfast, and he discovered John on the floor of his room. *Id.* at ¶12.   Kitsock testified at this deposition that he had no idea how his brother came to be on the

floor. *Id.* He further testified that he picked John up, wiped blood from his leg, pulled up his underwear, wrapped him in a sheet, and immediately took him to the emergency room. *Id.* at ¶13. In his affidavit, Kitscok describes finding John:

> At approximately 06:35 AM on 08/31/2010, I proceeded from my bedroom where I had finished dressing and proceeded to John's bedroom for we arranged to go for coffee as we usually do in the early mornings. I knocked on the door and entered and as I did, I saw John with his head wedged under the bed rail at the head of the bed closest to the door [the left side of the bed if one looked at the bed from the bottom], and the left side at the head of the bed was closest to the door. I knelt down and pulled his head out from under the left side bedrail at the top of the bed where his head was lodged between this rail and the floor. His forehead had hit the brass colored L-frame of the white roller ball attached on the bottom of the left leg of the bedrail near the headboard. There was an apparent forehead indention, such like it was struck by a blunt object or in this instance the head hit a solid blunt object coming rapidly in contact with his forehead. There was this indention matching the edge of this white roller ball brass frame where his head was lodged.
> As I was kneeling down, I pulled his head from underneath the bed frame, and noticed that on his left hip, upper portion of the left leg on the outside of the upper left hip, there was blood from a 2 inch by four inch long wound, more like a deep scratch on his upper leg. John moaned as I did this. I stood up and got a wash cloth to wipe the blood off his leg. I noticed that John had been attempting to put his underwear on because his jockey-like briefs were partially up his left leg at his knee and the other leg of the underwear was only around his right ankle.

*Doc. 40-1* at 2.

When Kitsock arrived at the emergency room of St. Catherine's Medical Center, John was taken in to be treated and efforts were made to resuscitate him.

10

*Doc. 33-1 (Baltimore Life's Statement of Undisputed Facts in Support of its Motion for Summary Judgment)* at ¶15 and *Doc. 40 (Plaintiffs, Dennis Kitsock, et al.'s, Statement of Undisputed Facts in Defense to Baltimore Life Insurance Company's Motion for Summary Judgment)* at ¶15. After attempts to revive John were unsuccessful, Dr. Gernerd pronounced John dead. *Id.* at ¶16. The emergency room records lists John's cause of death as "cardiac arrest." *Id.* at ¶17. The death certificate lists the cause of death as "cardiac arrhythmia," and notes "other nonsignificant conditions contributing to death," including chronic alcoholism, smoker's syndrome, and end stage emphysema. *Id.* at ¶18.

A claim under the policy was submitted to Baltimore Life based on John's death. *Id.* at ¶19. Baltimore Life paid the death benefit under the policy, but it denied the claim for accidental death benefits. *Id.*.

The plaintiffs present a letter addressed to their counsel from Dr. Robert Stratton, who briefly observed and treated John Kitsock in the emergency room on the day that John died. That letter reads:

> On April 22, 2010,[1] I was the ER physician on duty at St. Catherine's Medical Center. At 0700 hrs, on that date, a car pulled up to the ambulance dock, and an adult male, later identified as Dennis Kitsock, came in through the ambulance

---

[1] In the letter, there are parentheses around the date, a handwritten note reading "mistake 8/31/10," and the initials "R.S." *Doc. 40-2* at 2.

entrance asking for a wheelchair and help to get his brother from the car and into the ER, stating that his brother had just injured himself by falling out of bed.  A nurse took a wheelchair out to the car, and the patient was then brought in to the ER, while the brother was taken to the Triage area to start the registration process for the patient, soon to be identified as John Kitsock.  As the patient was wheeled past me (I was standing at the Nursing Station while completing my charts as it was the end of my shift), I noticed that the patient was slumped over to his right side, and appeared cyanotic and unconscious.  I quickly followed the nurse to the back area of the ER, where we lifted the patient from the wheelchair and onto a litter, as he was unresponsive.  I saw that the patient was not breathing, so I told the Nurse to call a Code, and another nurse to begin CPR while I prepared for intubation.  I also noticed that the patient had evidence of a head injury to the left forehead, presumptively a depressed skull fracture.  I also noticed that he had what appeared to be fresh blood on his pants [in the] left upper thigh area.  However, I did not seek to further evaluate the head or leg trauma at that moment as my first priority in a Code situation is always to secure the patient's airway.  As I was preparing for intubation, Dr. Mark Gernerd—who was my relief that day—arrived for duty.  He then offered to take over the Code, as would be customary in that situation, at that time (as his shift started at 0700 hrs.).  I then went to the Doctor's Call Room to pack up my things, and by the time I came back through the ER on my way out of the hospital, I saw that the Code ha[d] been unsuccessful, and that Dr. Gernerd was informing the patient's brother of the outcome.  I then left the hospital after signing the Cardiopulmonary Arrest Record.

It is my opinion, to a reasonable degree of medical certainty, that John Kitsock's fall out of bed on 04/22/2010[2] and resultant head injury, was a direct and proximate cause of his death.

---

2  *See Footnote 1.*

12

> If you have any further questions related to this case, please call.

*Doc. 40-2* at 2-3. The plaintiffs also presented the deposition testimony of Dr. Stratton about what he observed on the date of John's death, which testimony is consistent with the synopsis in his letter. *Doc. 40-3*.

### C. The Defendant Is Entitled to Summary Judgment.

The defendant seeks summary judgment on the basis that the plaintiffs have not established that John's death occurred as a result of an accident and, even if there was an accident, the plaintiffs have not established that John's death did not result solely or partly from mental or bodily infirmity.

"Where an insurance policy contains a clause providing for recovery for fatal injuries 'caused solely through violent external and accidental means,' then there may be recovery on the policy if the accident was the predominant or proximate cause of death." *Shiffler v. Equitable Life Assur. Soc. of U.S.*, 838 F.2d 78, 84 (3d Cir. 1988)(citing *Johnson v. Kentucky Central Life & Acc. Ins. Co.,* 18 A.2d 507, 511 (1941)). But "if the policy contains an additional clause precluding recovery if the death was caused directly or indirectly by disease, there can be no recovery if pre-existing disease contributed to the death." *Id.* (citing *Weiner v. Metropolitan Life Insurance Co.,* 416 F.Supp. 551 (E.D.Pa.1976); *Dunn v. Maryland Casualty Co.,*

13

488 A.2d 313 (1985)). Where the policy contains a provision excluding coverage for death caused wholly or partly by *inter alia* disease or bodily infirmity, "it is insufficient for plaintiff merely to show a direct causal relation between the accident and disability or death." *Rodia v. Metro. Life Ins. Co.*, 354 Pa. 313, 315 (1946). Rather, the plaintiff must "establish the death was caused solely by external and accidental means," and "[i]f the proof points to a pre-existing infirmity, which may have been a contributing factor, plaintiff must also produce evidence to exclude the possibility." *Id.* Thus, "[w]here it appears that [the] insured's death resulted from accidental injury acting in conjunction with a pre-existing and substantial physical infirmity, there can be no recovery." *Id.* at 315-16.

In this case, is it undisputed that the policy at issue contains both a clause requiring that the death must occur "solely through external, violent and accidental bodily injury" and a clause precluding recovery for "a death that results solely or partly from . . . mental or bodily infirmity, illness, disease or infection." *Doc. 5* at 21-22. And so the plaintiffs may recover only if John's preexisting infirmities, illnesses, or diseases did not contribute to his death.

The undisputed facts show that John suffered from numerous conditions that could have caused or contributed to his death, including conditions that made him unsteady and prone to falls. The defendants have presented evidence from Dr.

14

Salvatore Fiscina, M.D., that, in part, the basis for the defendant's denial of accidental death benefits was that the death involved John's preexisting medical conditions. *Doc. 33-12* at 3 & 5. Dr. Fiscina testified:

> **Q You already stated the basis of the denial, what were the medical conditions that, that were the basis upon which that denial was given by Baltimore Life.**
>
> A  Okay.  The conditions stemmed from several different illnesses.  If we look at the alcoholism, chronic alcoholism, there [were] two major effects. One, on the brain where he developed some alcohol related syndromes that are associated with ataxia, imbalance and to a large extent his cerebellar was on imaging studies shown to be markedly atrophic.  His brain mass volume was decreased which again you see as a result of chronic alcoholism and a premature dementia, but he had as a result also a gait dysfunction, he had imbalance that resulted in numerous falls over an extended period of time, at least three years.  As an alcoholic his dietary consumption was altered, he wasn't taking in sufficient vitamins particularly vitamin B1, which is thiamin and unfortunately the brain is dependent upon that and that's why he had the cerebral effects of that.
> Now, in addition the diabetes would have contributed to what we call ischemic changes in the brain that show that there is vascular, small arterial blood vessels were not supplying enough oxygen, getting enough oxygen to the brain, that was complicated because he had become anemic.  Again also because of his poor diet he had developed a macrocytic anemia, which means that it was nutritionally related[.]  [A]nd then one of the more difficult things is that he became incredibly, probably within the period of two years, became incredibly malnourished to the point where when he died he weighed 90 pounds, someone that's 5'9", 5'10" that's an incredible loss of ideal body weight[.]  [A]nd he's been described as being cachectic, which means basically he's undergone starvation or

15

> what occurs in concentration camps, you know[.] [H]e
> continued to do things that he was advised not to do and again the
> loss of weight, the malnutrition, malnourishment, it was
> profound and made him weak and also caused atrophy of the
> muscles in his legs, so in addition to his gait disturbances he had
> weakness, rather profound weakness and lack of energy, became
> sedentary, pressure ulcers and that then coupled with . . . the
> smoking he developed chronic obstructive pulmonary disease,
> COPD, but he, his COPD was advanced and severe and he
> became oxygen dependent on it for even minimal amount[s] of
> physical activity, that creates situations of not adequately
> oxygenating your blood and it can also affect other organs and
> tissues as a result. . . . [H]e also had some cardiac issues. He
> was diagnosed as having an acute myocardial infraction, I think,
> in 2009, and they recommended a catherization. I'm not sure
> whether or not that ever occurred because I didn't see the
> primary reporting, but his electrocardiogram had a left anterior
> hemiblock which is a conductive defect and made him prone to a
> dysrhythmia, cardiac dysrhythmia, which was ultimately the
> diagnosis by the emergency physician at the time of his death.

*Doc. 33-12 at 5.*

While the plaintiffs have submitted a letter from Dr. Stratton in which he states that in his medical opinion John's fall out of bed and resultant head injury were the direct and proximate cause of John's death, *doc. 40-2 at 3*, Dr. Stratton's opinion does not serve to exclude the possibility John's death resulted from accidental injury acting in conjunction with his pre-existing infirmities, illnesses, or diseases.³ The plaintiffs, who have not presented evidence about how John came to

---

3 In a footnote in its reply brief, the defendant argues that the letter from Dr. Stratton is not made under oath and, therefore, is not admissible. We do not address this

be on the floor of his bedroom, have failed to meet their burden. There is simply no basis for a reasonable trier of fact to conclude on this record that John died solely as a result of an accident and that his preexisting conditions did not contribute to his death. Accordingly, there is no basis to conclude that the defendant breached the contract of insurance or acted in bad faith in denying accidental death benefits in this case, and so the defendant is entitled to summary judgment.

## IV. Conclusion.

Accordingly, for the foregoing reasons, we will grant the defendant's motion (doc. 33) for summary judgment.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge

---

argument as it was raised only in a footnote. *See John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1076 n.6 (3d Cir.1997)("arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 457 n.14 (E.D. Pa. 2012)("An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote)."). Moreover, as discussed above, even considering the letter, the defendant is entitled to summary judgment.